2008 JUN -4 PM 4: 22

UNITED STATES OF AMERICA )
)
v. )
) CASE NO. CR107-108
MARYA FIELDS TAPP, )
)
    Defendant. )
)

## O R D E R

Before the Court is Defendant Marya Fields Tapp's Motion
for Specific Performance as to Downward Departure, or, in the
alternative, Motion to Dismiss the Indictment. (Doc. 40.) In
making these requests, Defendant has alleged bad faith and
misconduct on the part of the Government prosecutor, including
(1) improper coercion of Defendant's guilty plea; (2) a bad
faith refusal to file a § 5k1.1 motion for downward departure;
(3) manipulation of the federal and state court systems to avoid
federal judicial oversight; and (4) scheduling of Defendant to
testify before the grand jury without her counsel's knowledge or
consent. As discussed below, the Court declines to find a
constitutional violation that would warrant dismissal of the
indictment, and the Motions are **DENIED**.[1]

---

[1] In an Order issued February 6, 2008, this Court denied as moot
Defendant's Motion to Produce documents relating to the conflict
of interest issue, which was decided by that Order. Because the
conflicts issue has already been decided and because the Motion

## BACKGROUND

On October 3, 2007, Defendant Marya Fields Tapp was indicted on charges of conspiracy to possess with intent to distribute methamphetamine, distribution of methamphetamine, and possession with intent to distribute methamphetamine. The Government alleges that Defendant is a major distributor of crystal methamphetamine in the Augusta, Georgia area. State and federal agents executed a state search warrant at Defendant's home on August 16, 2007 and discovered more than 280 grams of methamphetamine, digital scales, and $5,914 in cash. (Doc. 43, Clayton Aff. ¶ 2.)

After the search, Defendant cooperated with the Government until October 2007. Her cooperation has been described as "outstanding," leading to more than fifteen new and related cases. (Id. ¶ 8.) There are six co-defendants charged in this case. Defendant signed a plea agreement on December 10, 2007, but has not yet pleaded guilty at a Rule 11 hearing before the Court.

Sometime between the August 16, 2007 search and Defendant's agreement with the Government on December 10, 2007, including the period of her cooperation, Defendant entered into an extramarital sexual relationship with the lead agent on the

to Produce was denied, the Government's Motion to Quash Subpoenas (Doc. 52) is also **DENIED AS MOOT.**

case, James Tredore, a former Richmond County Sheriff's Office Investigator and Task Force Officer with the Drug Enforcement Administration. Government agents learned of this affair in late October 2007. Tredore admitted the affair and resigned.

The Assistant United States Attorney (AUSA) assigned to the case, Patricia Johnson, was a personal friend of Agent Tredore. According to Defendant, AUSA Johnson blamed Defendant for the inappropriate relationship that ended Tredore's career. Defendant contends that Johnson made it her "mission" to get even with Defendant and that Johnson engaged in prosecutorial misconduct to accomplish this end. Defendant alleges that Johnson threatened defense counsel Richard Ingram and inappropriately pressured Defendant to accept an unfavorable plea agreement. These allegations of misconduct are discussed more fully below.[2]

## ANALYSIS

### I.  The Plea Agreement and the Motion for Downward Departure

Defendant states that she is ready and willing to plead guilty and wishes to do so freely and voluntarily. But she alleges that AUSA Johnson engaged in prosecutorial misconduct during the plea negotiations. She claims that Johnson

---

[2] Defendant also alleges that the Government chilled her right to counsel by threatening Mr. Richard Goolsby, an attorney retained by Defendant. The Court has already issued its decision regarding Mr. Goolsby's conflict of interest.

(1) threatened to file a § 851 sentencing enhancement if Defendant did not sign a plea agreement by December 10, 2007;[3] (2) retracted her promise to file a downward departure motion based on Defendant's cooperation; and (3) threatened that South Carolina authorities could also prosecute if Defendant did not agree to plead guilty. She alleges that these threats were made in bad faith during a series of recorded telephone calls with Ingram.

Johnson claims that she gave Defendant a deadline for signing a plea agreement because she needed to begin preparing for trial. She states that she did not "guarantee" that the Government would file a 5K1.1 Motion for Downward Departure based on Defendant's cooperation. The Government also contends that the value of Defendant's cooperation was substantially reduced as a result of her affair with Tredore.

"To punish a person because he has done what the law plainly allows him to do [such as exercise his rights as a criminal defendant] is a due process violation of the most basic sort." Bordenkircher v. Hayes, 434 U.S. 357, 363, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978). With respect to plea negotiations, however, the Supreme Court has consistently held that due process is not violated by the "give-and-take" between

---

[3] Defendant claims that the § 851 enhancement would double the mandatory minimum from ten years to twenty years.

4

the prosecutor and a defendant, even where the prosecutor threatens more serious punishment if the Defendant does not plead guilty. E.g., id. "While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable' - and permissible - 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" Id. at 364 (citing Chaffin v. Stynchcombe, 412 U.S. 17, 31, 93 S. Ct. 1977, 36 L. Ed. 2d 714 (1973)). Despite the difficult choices facing a defendant, there is no element of punishment or retaliation where the accused is free to accept or reject the prosecution's offer. [4] Id.

In the instant case, AUSA Johnson presented Defendant and her counsel with a difficult choice and a strict deadline for agreeing to a guilty plea. Although Defendant objects to the manner in which Johnson presented the choice, this is insufficient to rise to the level of a constitutional violation warranting a dismissal of the indictment.

With respect to a downward departure motion, the Government may refuse to file such a motion for many reasons, and it enjoys

---

[4] Regarding issue of the voluntariness of a plea, the Court agrees with the Government that this issue is not ripe for review. Although Defendant has signed a plea agreement with the Government, she has not yet pleaded guilty.

broad discretion in making this decision. On the other hand, it is well-established that the Government may not refuse to file a § 5K1.1 motion for an unconstitutional motive, such as the defendant's race or religion. See Wade v. United States, 504 U.S. 181, 185, 112 S. Ct. 1840, 118 L. Ed. 2d 524 (1992)(holding that prosecutor's discretion is subject to constitutional limitations). The Eleventh Circuit recently held that the Government may not refuse to file a § 5K1.1 motion in retribution for a defendant exercising his or her Sixth Amendment right to a trial by jury. United States v. Dorsey, 512 F.3d 1321, 1324-25 (11th Cir. 2008). If the Government declines to file a § 5K1.1 motion in this case, the Defendant may seek to show that the Government's decision was based on an unconstitutional motive such as prosecutorial vindictiveness. See id. (setting forth standards to be applied by district court on remand). But the Court will not order the Government to file such a motion at this time.

## II.   The "Parking" Allegation

Defendant also claims that the Government improperly manipulated the federal and state court systems by "parking" this investigation in the state system to avoid federal judicial oversight and the requirements of the Speedy Trial Act, 18 U.S.C. § 3161. The Court finds that there was neither a

constitutional violation nor a violation of the Speedy Trial Act.

To establish a due process violation from a pre-indictment delay that would require dismissal of the indictment, a defendant must show "(1) that the government delayed bringing the indictment in order to gain a tactical advantage; and (2) that the delay caused him actual and substantial prejudice." United States v. Fuesting, 845 F.2d 664, 669 (7th Cir. 1988). The allegations of actual and substantial prejudice must be specific, concrete, and supported by the evidence. Id.

The Court finds that any delay in this case does not rise to the level of "actual and substantial" prejudice. Federal and state authorities executed the state search warrant that discovered the methamphetamine on August 16, 2007, and the federal grand jury returned the Indictment on October 3, 2007. As a result of Defendant's cooperation, state and federal authorities continued their investigation against other members of the alleged conspiracy. The Supreme Court has rejected the argument that prosecutors are constitutionally obligated to file charges before their investigations are complete, even if they have marshaled enough evidence to prove a defendant guilty beyond a reasonable doubt. United States v. Lovasco, 431 U.S. 783, 792-795, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977) ("[C]ompelling a prosecutor to file public charges as soon as

the requisite proof has been developed against one participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act."). Defendant's claims of excessive delay are therefore rejected.

The Court also rejects Defendant's claim that the Speedy Trial Act is implicated by the facts of this case. The Speedy Trial Act requires the Government to file an information or indictment within 30 days after an arrest in connection with "such charges." 18 U.S.C. § 3161(b). But only an arrest in connection with federal charges triggers the Speedy Trial Act. United States v. Mills, 964 F.2d 1186, 1193 (D.C. Cir. 1992). Because Defendant was not arrested on federal charges prior to the Indictment, the Speedy Trial Act does not apply.

## III. Defendant's Grand Jury Testimony and the No-Contact Ethics Rule

Defendant states that AUSA Johnson scheduled her to appear and testify before the grand jury without contacting defense counsel to either notify him or obtain his consent. Both parties agree that Defendant knew she was a target of the investigation and that she voluntarily appeared and testified before the grand jury. Defendant contends that the Government's failure to notify her attorney violated her Fifth and Sixth Amendment rights and deprived her of the opportunity to plea

bargain prior to the grand jury. The grand jury indicted Defendant shortly after her testimony.

This Court must decide whether the AUSA's conduct in this sequence of events warrants the relief sought by Defendant. To answer this question requires a review of the applicability of the so-called "No-Contact Rule" to federal prosecutors and a determination of what courts should do if they find a violation of this rule.

### A.  The History of the No-Contact Rule

#### 1.  Background

Throughout American legal history, attorneys have honored the rule prohibiting attorneys from communicating with a represented adverse party. Some version of this rule has been enacted in all fifty states and in every federal court. Moreover, the rule has been adopted by the American Bar Association's Model Code of Professional Responsibility, Model Rules of Professional Conduct, and Restatement 3d § 99. For most of its existence, the rule has enjoyed relative peace, not having any significant challenges to its general validity. However, the validity of the No-Contact Rule, at least as applied to one segment of the legal world, has recently come under attack.

In 1989, for the first time, the United States Department of Justice argued that courts should carve out an exception to

the No-Contact Rule. The Department asserted that federal prosecutors should be exempt from the prohibition from contacting represented adverse parties, and it argued that there was legal authority that supported such exemption. However, because the American Bar Association ("ABA"), the defense bar, Congress, and the federal courts and state courts did not agree, the Department's assertion sparked one of the more significant controversies regarding criminal procedure in recent history.

The ethical rule that prohibits attorneys from communicating with represented parties without the consent of the parties' counsel stems from English common law.[5] It is a rule that has been followed "from time immemorial by the Anglo-American bar." United States v. Jamil, 546 F. Supp. 646, 651 (E.D.N.Y. 1982), rev'd, 707 F.2d 638 (2d Cir. 1983). Regardless of the source of the general principle, the current No-Contact Rule may have its origin in an 1836 treatise on legal study.[6]

---

[5] See generally Harry O. Bowman, A Bludgeon By Any Other Name: The Misuse of "Ethical Rules" Against Prosecutors to Control the Law of the State, 9 Geo. J. Legal Ethics 665, 721 (1996).

[6] David Hoffman, A Course of Legal Study (2d ed. 1836); see also Jamil, 546 F. Supp. at 651 (referring to Hoffman's Resolution XLIII); John Leubsdorf, Communicating with Another Lawyer's Client: The Lawyers Veto and the Client's Interests, 127 U. Pa. L. Rev. 683, 684 (1979) (indicating that No-Contact Rule can be traced to Hoffman's treatise). According to Bowman, supra note 5, at 722 n.260, "Hoffman's Resolution XIII provided that 'I will never enter into any conversation with my opponent's client relative to his claim or defense except with the consent and in the presence of his counsel.'").

The rule may originally have been considered more of a professional courtesy than a legal mandate.

The idea that an attorney has absolute control over communications with his client became generally accepted when the ABA created the Canons of Ethics in 1908. Since that time, rules embodying this fundamental ethical precept have been adopted in every state, usually following one or another of the models offered by the ABA. The principle was continued without significant change or discussion until 1970, when the ABA adopted its Model Code of Professional Responsibility. In that Model Code, Disciplinary Rule 7-104(A) governed contact with represented parties, superseding the 1908 rule. After this, Model Rule 4.2, adopted by the ABA in 1983, carried forward without substantial change the No-Contact Rule embodied in the 1970 Model Code Disciplinary Rule 7-104(A).[7] Model Rule 4.2, as adopted in 1983, stated:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a <u>party</u> the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

MODEL RULES of PROF'L CONDUCT R. 4.2 (1991)(emphasis added).

In 1995, Model Rule 4.2 was amended as follows:

---

[7] <u>See</u> ABA Comm. On Ethics and Professional Responsibility, Formal Op. 396 (1995) (examining the history of the prohibition); Bowman, <u>supra</u> note 5, at 722.

> In representing a client, a lawyer shall not
> communicate about the subject of the representation
> with a _person_ the lawyer knows to be represented by
> another lawyer in the matter, unless the lawyer has
> the consent of the other lawyer or is authorized by
> law to do so.

MODEL RULES of PROF'L CONDUCT R. 4.2 (2007) (emphasis added).

This Rule is substantially identical to Disciplinary Rule 7-104(A)(1) except for the substitution of the term "person" for "party." This change was to make clear that Rule 4.2 applies to contacts with represented persons whether or not they are "parties" to a proceeding or a transaction.

The ABA's annotations to Model Rule 4.2 explain that the rationale of the rule is to "protect[] clients against overreaching by other people's lawyers" and "reduce[] the likelihood that clients will disclose confidential or damaging information." ANN. MODEL RULES OF PROF'L CONDUCT R. 4.2, Commentary at 392 (6th ed. 2007).

Model Rule 4.2 originated as a professional courtesy on the civil side of the judicial system. However, in the 1960's, courts began to raise the question of whether the No-Contact Rule might apply in criminal cases.[8] Today, Comment 5 to the

---

[8] See Bowman, _supra_ note 5, at 722 n. 270 ("See _Lee v. United States_, 322 F.2d 770, 777 (5th Cir. 1963) (presuming that legal ethics prohibit a government attorney's attempt to communicate with a represented defendant without counsel's consent); _Ricks_

Rule indicates that it applies to prosecutors: "When communicating with the accused in a criminal matter, a government lawyer must comply with this Rule in addition to honoring the constitutional rights of the accused." MODEL RULES OF PROF'L CONDUCT R. 4.2 cmt. 5 (2007).

Most states have adopted ABA Model Rule 4.2, or some extremely close variation, into their own rules of professional conduct. Several states apparently have adopted the predecessor ABA Model Code of Professional Responsibility, or a variation thereof, which is quite similar to Model Rule 4.2. At least four states (California, New Jersey, Texas, and Utah) appear to have developed their own rules concerning communications with represented individuals. At least one state, Utah, provides an anti-communication rule which specifically addresses prosecutorial communications with criminal suspects.[9]

---

v. United States, 334 F.2d 964 (D.C. Cir. 1964) (describing as "consistent with Canon 9" the government's practice of not allowing any communication between police or prosecutors and a represented defendant except with counsel's consent); Mashies v. United States, 374 F.2d 312 (D.C. Cir. 1967) (noting that the U.S. Attorney has, in some cases, implemented a policy of notifying counsel for the criminal defendant of any interrogation sessions).").

[9] See Utah Rules of Professional Conduct, Rule 4.2(b), "Communication with Person Represented by Counsel" (1999). See also Utah v. Ford, 793 P.2d 397, 399 (1990).

### 2. Department of Justice Policies: The Thornburgh Memorandum and the Reno Rule

Although there were several federal court opinions prior to 1988 stating that federal prosecutors were subject to federal court or state bar ethics rules, no opinion took specific action to enforce the No-Contact provision. That changed with the 1988 decision in United States v. Hammad, 858 F.2d 834 (2d Cir. 1988). The Hammad case held that the No-Contact Rule not only applied to civil disputes, but to criminal prosecutions as well. The case also held that the prosecutor in the case had violated the No-Contact Rule. This case was the catalyst for the Department of Justice's attempt to seek exemption from the ethical rule.[10]

### a. The Thornburgh Memorandum

In 1989, in an effort to get around the holding in Hammad, then-United States Attorney General Richard Thornburgh issued an internal Justice Department memorandum ("Thornburgh Memorandum"), purporting to exempt all Department of Justice lawyers from compliance with the No-Contact Rule. See Memorandum from Richard Thornburgh, Attorney General, to All Justice Department Litigators (June 8, 1989). The Thornburgh Memorandum instructed assistant United States Attorneys to

---

[10] See Neals-Erik William Delker, Ethics and the Federal Prosecutor: The Continuing Conflict Over the Application of Model Rule 4.2 To Federal Attorneys, 44 Am. U. L. Rev. 855, 860 (1995).

ignore state ethical rules and instead to adhere exclusively to the policy of the Department of Justice. An uproar regarding Model Rule 4.2 emerged in reaction to the Thornburgh Memorandum.

Almost from the date of its issue, the Thornburgh Memorandum set off a firestorm of criticism from the organized defense bar. Once the memorandum became widely circulated, the protest then resonated from the ABA, the state bar associations, the Judicial Conference of the United States, the Conference of State Chief Justices, the Federal Bar Association, and others.

The Thornburgh Memorandum threatened not only the inherent supervisory power of the federal judiciary over officers of the court, but also the ability of the states to oversee the ethical standing of the attorneys licensed in their respective jurisdictions.[11]

### b. The Reno Rule

The start of the Clinton administration did not bring change in the Department's position on Rule 4.2. Instead, Attorney General Janet Reno chose to move forward with the issuance of her version of the controversial Thornburgh Memorandum. She attempted to make the policy substantive law by using the rule-making authority given to federal agencies. This move, dubbed the "Reno Rule," provided, for all practical purposes, a blanket exemption from the No-Contact Rule for

---

[11] See Delker, supra note 10.

Justice Department lawyers in both civil and criminal investigations. The Reno Rule stated that the Department "intends" the communication with represented persons authorized by the Regulation to come within the "authorized by law" exception to Rule 4.2, and, if there was a conflict, the Reno Rule preempted any inconsistent state or local law. The Reno Rule also attempted to preempt Court regulation and supervision in the event of a violation of Rule 4.2.

Although the regulation is no longer in effect, 28 C.F.R. § 77.12 provided:

> Communications with represented parties and represented persons pursuant to these rules are intended to constitute communications that are "authorized by law" within the meaning of Rule 4.2 of the American Bar Association Model Rules of Professional Conduct, DR 7-104(A)(1) of the ABA Code of Professional Responsibility, and analogous state and local federal court rules. In addition, these rules are intended to preempt the application of state and local laws and rules to the extent that they relate to contacts by attorneys for the government, and those acting at their discretion or under their supervision, with represented parties or represented persons in criminal and civil investigations and litigation. They are designed to govern the conduct of attorneys for the government in the discharge of their duties to the extent that state and local laws or rules are inconsistent with these rules. When the Attorney General finds a willful violation of any of these rules, however, sanctions for the violation of this rule may be applied, if warranted by the appropriate disciplinary authority.

The Reno Rule was promulgated over the objections of the judiciary, the ABA, and almost all organized bar organizations.

3.   **The Response to the Thornburgh Memorandum and the Reno Rule**

   a.   **The response of the Conference of Chief Justices**

The initial debate over the Thornburgh Memorandum's validity took place in a variety of arenas, including American Bar Association meetings and Congressional Conferences. However, the perspective of those opposed to the Department of Justice's Memorandum was perhaps best articulated by the Conference of Chief Justices.[12]   Since the early protest to the Thornburgh Memorandum in 1989, the Department of Justice had been in negotiations with the Conference of Chief Justices over proposed ethics rule amendments to Rule 4.2 that would be a reasonable compromise to satisfy all parties' concerns on this issue.

The Conference of Chief Justices disputed the authority of the Attorney General to establish exclusive jurisdiction over the ethical conduct of federal prosecutors, since in its view the regulation of all lawyers has traditionally been the province of state supreme courts.   At the time of the Attorney General's adoption of the Reno Rule regulation in 1994, the Chief Justices Conference denounced the regulation and adopted a resolution urging its members to continue to enforce the ethics

---

[12] This conference brings together Chief Justices from State Supreme Courts around the United States.

rules upon <u>all</u> members of bars of the various states and jurisdictions, including federal prosecutors. The resolution stated:

NOW, THEREFORE, BE IT RESOLVED as follows:

1. The Conference endorses the Comment and proposed resolution prepared and submitted by the Committee, and strongly opposes the Proposed Rule and the Final Rule of the Department.

2. The Conference respectfully urges the Attorney General not to make the Proposed Rule final as stated in the Department's letter of August 1, 1994 and to continue discussions with representatives of the Conference in an effort to resolve the issue and to avoid any regrettable constitutional confrontation which might arise if and when the Final Rule is implemented.

3. Without regard to the adoption of the Proposed Rule by the Attorney General, the Conference respectfully urges each of its members to continue to enforce the ethical rules upon all members of bars of the various states and jurisdictions.[13]

### b. Response by the federal courts

In 1998, the Eighth Circuit considered the Reno Rule and held that the regulations were invalid. <u>United States ex rel. O'Keefe v. McDonnell Douglas Corp.</u>, 132 F.3d 1252, 1257 (8th Cir. 1998). The Government argued that the regulations superseded the local ethics rules and that, under the regulations, the disputed ex parte contacts by Department

---

[13] Conference of Chief Justices, Resolution, Proposed Rule Relating to Communications with Represented Persons, unanimously adopted by the Conference of Chief Justices at the Forty-sixth Annual Meeting, on August 4, 1994.

attorneys were "authorized by law" and thus fell under the express exception to the No Contact Rule. But the Court found that the Attorney General lacked the statutory authority to promulgate the rule and that the provision was therefore invalid and of no effect. The Court stated, "we cannot reasonably conclude that the grants of authority in the statutory provisions cited by the government contemplate the issuance of anything resembling [the Reno rule]." Id.

### c. Congress's response: the Citizens Protection Act

Historically, Congress has had the ultimate authority over federal prosecutors. After all, Congress created the Department of Justice, and thus it has always been up to Congress to decide how to regulate Department's attorneys. This regulation extends to both civil and criminal responsibilities of the Department. However, in the majority of the cases, controversy has only arisen with respect to attorney regulation within the criminal sphere. Until 1998, Congress had consistently left any question regarding the regulation of federal prosecutors' ethical duties to the states. Congress's decision to do so largely stemmed from its desire to avoid confrontation with the judicial branch regarding how attorneys should behave in their respective jurisdictions. Thus, all issues regarding ethics were decided by state law or federal local rules.

The Thornburgh Memorandum and the Reno Rule opened the debate among Congressional members concerning the regulation of federal prosecutors' ethics. In 1998, with a lead by Congressman Joseph McDade (R-Pa.), the debate produced a legislative result: the Citizens Protection Act. 28 U.S.C. § 530B (hereinafter the "CPA" or "McDade Act"). This law, which went into effect in 1999, in essence stated that any ethical rules that applied to other attorneys also applied to federal prosecutors.[14]

---

[14] This federal legislation is commonly referred to as "The McDade Act" after Congressman McDade. But perhaps it should be called "McDade's Revenge," because there can be no doubt that Congressman McDade's personal contempt for Department of Justice prosecutors and the adoption of the Reno Rule led to his efforts to pass the Act. See Rep. McDade testimony before the subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 104th Cong. (1996).

In 1992, around the time of the dispute over the Thornburgh Memorandum, a federal grand jury in the Eastern District of Pennsylvania indicted Congressman Joseph McDade. United States v. McDade, 28 F.3d 283 (3rd Cir. 1994). The federal indictment charged McDade with accepting campaign contributions in exchange for using his influence on behalf of government contractors and their lobbyist. From the very beginning of the case, McDade claimed that the federal investigators and prosecutors in his case had engaged in prosecutorial misconduct and ethics violations. In 1996, Congressman McDade was acquitted by a jury of all charges and retained his seat in Congress.

Almost immediately after his acquittal, Congressman McDade introduced his first attempt to pass the Citizens Protection Act. See H.R. 3386, 104th Cong. (1996). He tried again in the next Congress. See H.R. 232, 105th Cong. (1997). He was successful on his third attempt, H.R. 3396, 105th Cong. (1998), when his bill was included in a rider to an omnibus appropriations bill. The bill became law on October 21, 1998. See 28 U.S.C. § 530B.

The pertinent portion of the CPA is entitled "Ethical standards for attorneys for the Government" and provides:

> (a) An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.
>
> (b) The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.
>
> (c) As used in this section, the term "attorney for the Government" includes any attorney described in section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations and also includes any independent counsel, or employee of such a counsel, appointed under chapter 40.

28 U.S.C. § 530B. The CPA requires federal prosecutors to abide by state ethics standards, regardless of whether local federal courts have adopted state standards.

There is little doubt that the CPA is a thorn in the side of the Department of Justice.

> "Since April, 1999, when McDade became effective, the Department of Justice has sought corrective legislation to temper the scope and impact of the law upon the exercise of federal law enforcement efforts. The Justice Department has argued that the McDade law has impeded important criminal prosecution, chilled the use of traditional federal investigative techniques and posed multiple hurdles for federal prosecutors."

The Federal Lawyer, Vol. 48, Number One, p. 21 (Jan. 2001).

Leading senators, from both sides of the aisle, have attempted to amend the CPA. But the CPA remains in effect, and

the Department of Justice formally adopted the law as part of its own regulations in 1999, superseding the Reno Rule. 28 C.F.R. § 77.3.

## B. The Department of Justice's Position on its Exemption from State Ethics Rules

Even after the passage of the CPA, the Department of Justice has continued to take the position that federal prosecutors should be exempt from the No-Contact Rule.[15] But as discussed below, it is this Court's opinion that prosecutors' unique duty does not justify less-demanding ethics rules for Department of Justice lawyers.

### 1. The Department of Justice and its Inception

Congress established the position of Attorney General and United States Attorney in the Judiciary Act of 1789 when the federal system was inaugurated. The statute provided for the appointment in each federal district of "a meet person, learned in the law to act as the attorney for the United States." Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93. His statutory duties were to "prosecute in each district all delinquents for crimes and offenses cognizable under the

---

[15] For example, when issuing the new regulations, the Department stated: "The decision to replace the Department's regulation on contacts with represented parties [known as the Reno Rule] does not constitute a determination that any of the conduct previously authorized by those regulations is impermissible." Ethical Standards for Attorneys for the Government, 64 FR 19273, 19274 (1999).

authority of the United States, and all civil actions in which the United States shall be concerned." Id. From the outset, United States Attorneys had a unique responsibility as public legal officers. First, they had both criminal and civil jurisdiction. Second, they had broad discretion regarding enforcement proceedings, including whether to bring them and how they would be brought about.

The Judiciary Act of 1789 gave the Attorney General no authority whatsoever to supervise or direct United States Attorneys. They represented the federal government as they saw fit. Each was king in his own domain, and was directly answerable only to the President who appointed him.

In 1861, Congress enacted a statute giving the Attorney General "superintendence and direction" of United States Attorneys and United States Marshals, although there was no official exercise of that power for several years. Act of Aug. 2, 1861, 37th Cong., 1st Sess., ch. 37, 12 Stat. 285, 327. When Congress established the Department of Justice in 1870, it also granted the Attorney General power to supervise United States Attorneys, but it was not until Congress acted in 1896 to empower the Attorney General to appoint Assistant United States Attorneys that the Attorney General had a direct say in how local United States Attorney's offices were staffed and run.

Few institutions continue today with as little change as the Department of Justice.[16]

A major change for Justice Department lawyers took place in 1979 when Congress mandated that they be admitted to practice and licensed by the state courts, thereby placing them under the supervision of these courts concerning their professional conduct. The Department of Justice Appropriation Authorization Act, Fiscal Year 1980, prohibits "the compensation of any person hereafter employed as an attorney (except foreign counsel employed in special cases) unless such person shall be duly licensed and authorized to practice as an attorney under the laws of a state, territory, or the District of Columbia." Pub. L. No. 96-132, 93 Stat. 1040, 104 (1979).

### 2. Department of Justice Attorneys: A Unique Job

A Department of Justice attorney's role has two goals that sometimes conflict. On the one hand, a federal prosecutor in a criminal case is to represent the government. On the other, a federal prosecutor must respect the rights of the accused throughout the judicial process. United States Supreme Court Justice George Sutherland summarized the prosecutor's dual role in 1934:

---

[16] Whitney North Seymour, Jr., United States Attorney An Inside View of "Justice" in America Under the Nixon Administration (1975); James Eisenstein, Counsel for the United States U.S. Attorneys in the Political and Legal Systems (1978).

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88, S. Ct. 629, 79 L. Ed. 1314 (1935).

These time honored and profound words of Justice Sutherland ring just as true today as they did more than seventy years ago. Throughout the Justice Department building in Washington, D.C., and in every United States Attorney's Office in the country, you will find this famous quote framed and hanging on the walls. As Justice Sutherland's remarks illustrate, Department of Justice lawyers are unique in our legal system because they are obligated, above all, to serve justice.

### 3. The Department of Justice and its Position Regarding State Ethics Rules

Ethics regulators have always recognized the unique role of prosecutors. The traditional understanding about state and federal prosecutors is that they should have heightened ethical responsibilities. Traditional thinking is that federal

prosecutors should represent the government in a loyal and disinterested manner. They are charged with an overarching duty to seek justice.

Unfortunately, the Department of Justice has taken the position that federal prosecutors should only be subject to state ethical rules when those rules do not conflict with what the Department sees as the discharge of its official duties. In other words, the Department should decide when and under what circumstances a state ethical rule should apply to its lawyers and when it should not.

To bolster its position, the Department has argued that federal prosecutors are already subjected to many institutional restraints on their conduct. That federal prosecutors' conduct is subjected to continual and pervasive scrutiny by the Department of Justice would suggest that they are more regulated than are other members of the bar. But the argument that the internal Department of Justice supervision of its lawyers obviates the need for its lawyers to be subjected to an independent system of state ethics laws and regulations as administered by state and local federal courts has not been well-received by the judiciary and various bar organizations.

The Department of Justice has also argued that its prosecutors are different because (1) they play an increasingly active role in supervising federal agents in investigations and

should not be restricted by professional ethics protections that do not apply to non-lawyer agents and (2) ethics rules are sometimes interpreted differently by state courts throughout the country, resulting in non-uniformity for federal prosecutors admitted to practice in different states who are working on the same criminal case. However, these concerns are not markedly different from those faced by state prosecutors[17] and by many trial lawyers in private practice who regularly engage in multi-state litigation.[18]

As a practical matter, neither the No-Contact Rule nor any other ethical rule generally presents any serious problems for Department of Justice lawyers. Most state ethics rules are irrelevant to prosecutors' work, because full-time federal prosecutors do not engage in much of the professional conduct that is regulated by disciplinary rules.[19]

Compliance with ethical provisions applicable to all lawyers advances the service of justice and creates trust among the judiciary, the legal profession, and the public. Even law enforcement concerns should not justify less-demanding ethics

---

[17] As a general rule, state prosecutors do not engage in multi-state litigation and do not have the civil responsibilities of their federal counterparts, but they share the same duty to represent the government on the one hand and respect the rights of the accused on the other.

[18] Samuel Dash, An Alarming Assertion of Power, Judicature, Vol. 78, No. 3 (Nov.-Dec. 1994).

[19] See Larry D. Thompson, The McDade Law is Good for the Profession, The Federal Lawyer, Vol. 48, Number One (Jan. 2001).

rules for Department of Justice lawyers. Department of Justice lawyers should set the example – not try to lower the ethical bar through the Department's own regulations.

## C. The Positions of Congress and the Federal Courts on the No-Contact Rule and the Thornburgh Memorandum

### 1. Who Regulates Federal Prosecutors? Congress and the Supreme Court Have Deferred to Local Jurisdictions

For nearly one hundred years, regulation of the conduct of lawyers who appear in either federal or state courts has been a matter left almost exclusively to the local courts in their respective jurisdictions. Neither the United States Supreme Court nor Congress has attempted to thwart this tradition. In fact, both the Supreme Court and Congress seem to have actively encouraged local courts to create their own rules for attorney conduct. As the Supreme Court stated in Leis v. Flynt, 439 U.S. 438 (1979), "Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions." Id. at 442.[20] Moreover, Congress has never

---

[20] Also, the Supreme Court has continually held that decisions regarding attorney conduct should be left to the jurisdiction of the courts in which the attorney was practicing. See In re Lockwood, 154 U.S. 116, 117, 14 S. Ct. 1082, 38 L. Ed. 929, (1894) ("[T]he right to control and regulate the granting of license to practice law in the courts of a state is one of those powers that was not transferred for its protection to the federal government, and its exercise is in no manner governed or controlled by citizenship of the United States in the party

enacted a set of uniform rules of admission or practice for any court. In fact, the only rules that Congress has passed on the issue suggest that the federal rule is this: There should be no federal rules regarding attorney conduct. In other words, Congress has expressly mandated that issues of attorney conduct are left up to the states and federal courts before which the attorney is practicing.[21]   Congress's mandate has not been muddied by the congressional legislation on the issue, the Citizens Protection Act. If anything, the CPA, by expressly providing that the local ethical rules of courts should apply to federal prosecutors as well as other attorneys, suggests that Congress wants to make its mandate even more clear and forceful.

Thus, at both the federal and state level, each court has historically created its own set of rules regarding the conduct

---

seeking such license."); In re Summers, 325 U.S. 561, 570-571, 65 S. Ct. 1307, 89 L. Ed. 1795, (1945) (holding that the Illinois Supreme Court had the right to determine what rules would govern the conduct of the attorney's admitted to practice in its court); Middlesex County Ethics Comm. v. Garden St. Bar Ass'n., 457 U.S. 423, 434, 102 S. Ct. 2515, 73 L. Ed. 2d 116, (1982) ("The State of New Jersey has an extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses. States traditionally have exercised extensive control over the professional conduct of attorneys. The ultimate objective of such control is the protection of the public, the purification of the bar and the prevention of a re-occurrence.").

[21] Both 28 U.S.C. § 2071, et seq. and Fed. R. Civ. P. Rule 83 give courts the discretion to govern the conduct of attorneys practicing before their respective courts. See, e.g., Zambrano and Tofolla v. City of Tustin, 885 F.2d 1473, 1479 (9th Cir. 1989).

of lawyers practicing before it. In the states, those rules stem from the mandates of the state bar of its jurisdiction. See In re Allred, 777 P.2d 905 (1989)(implying that rulings of the federal courts regarding matters of attorney conduct in the federal courts do not have any binding power over state courts). In the federal arena, the individual districts promulgate their own codes of ethical attorney conduct, though admission to practice in all levels of federal courts has always largely contingent on prior admission to a state bar. See In re Ruffolo, 390 U.S. 544, 547 (1968)("Though admission to practice before a federal court is derivative from membership in a state bar, disbarment by the State does not result in automatic disbarment by the federal court."); Theard v. United States, 354 U.S. 278, 281 (1957) ("The two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers. . . .").

### 2. Case Law Regarding the Applicability of the No-Contact Rule To Federal Prosecutors

The central debates in the federal district and appellate courts have focused on two issues. First, the courts have grappled with the issue of whether the Department of Justice can legally proclaim that its prosecutors are exempt from the No-Contact Rule. Second, in the cases that found that prosecutors were not exempted from the rule, the courts had to decide what

protections the No-Contact Rule afforded defendants. Three illustrative cases are discussed below.

### a. United States v. Hammad

Decided in 1988, this case was the catalyst for the Thornburgh Memorandum. United States v. Hammad, 858 F.2d 834, 836 (2d Cir. 1988). The defendant in the case was indicted on forty-five counts for various crimes, including thiry-eight counts of mail fraud, an arson count, and attempted fraud of an insurance company. See id. at 836. The grand jury's indictment, however, largely stemmed from the defendant's taped conversations with a government informant subsequent to the defendant retaining counsel.[22] Thus, the defendant moved to suppress the evidence, claiming that the Government, through the informant, had violated the New York No-Contact Rule by directly communicating with the defendant while he was represented by a lawyer. See id. In response, the federal prosecutor and the United States argued that the No-Contact Rule only applied to civil disputes and was "irrelevant to criminal investigations." See id.

The court held that, contrary to the Government's assertion, the No-Contact Rule applied to both civil disputes

---

[22] There is some dispute regarding whether the defendant had retained counsel. However, the court treated the issue as if the defendant had retained counsel, as the Government had produced no evidence to the contrary. Id. at 836.

and criminal prosecutions. Id. at 837-38. Therefore, the court found, the No-Contact Rule applied to federal prosecutors. Id. The court also resolved a previously open question: whether the No-Contact Rule applied to federal prosecutors who contacted (either directly or through a government informant) represented defendants during an investigation but prior to the defendant's indictment or arrest.[23] Though the court declined to establish a bright-line rule on this issue, the court found that federal prosecutors could be subject to the No-Contact Rule in such a scenario. Id. at 840. Moreover, the court found that the federal prosecutor in this case had violated the No-Contact Rule by contacting, via a government informant, the represented defendant during the investigation.[24] Id. at 839. Nevertheless, the court found that suppression of the evidence the government informant unearthed was unwarranted.[25] Id. at 842.

---

[23] The issue had been brewing in the Second Circuit. See United States v. Vasquez, 675 F.2d 16, 17 (2nd Cir. 1982) (per curiam) (holding that the No-Contact Rule's applicability in criminal investigations "is doubtful"); but see United States v. Jamil, 707 F.2d 638, 646 (2nd Cir. 1983) (holding that the No-Contact Rule's applicability in criminal investigation was an open question).

[24] However, the court noted that defendants who have something akin to in-house counsel may not always be protected by the No-Contact Rule, as they are always represented by counsel. See Hammad, 850 F.2d at 842.

[25] It did so, however, for reasons not directly related to the federal prosecutor's violation of the No-Contact Rule. See id. at 842.

### b.   United States v. Lopez

This was the seminal case discussing whether the Thornburgh Memorandum exempted federal prosecutors from the No-Contact Rule, and it set out law that has not been seriously contradicted by other courts addressing the issue.   United States v. Lopez, 765 F. Supp 1433, 1438 (N.D. Cal. 1991), vacated on other grounds, 4 F.3d 1455 (9th Cir. 1993).

The defendant in the case was indicted for conspiracy to distribute and distribution of cocaine.   Following his indictment, the defendant retained counsel.   Nevertheless, the federal prosecutor held meetings with him.[26]   Lopez, 765 F. Supp. at 1440-44.   In those meetings, which concerned a possible plea agreement, the defendant's counsel was not present and was not aware the meetings were occurring.   Id. at 1444.   After the defendant's attorney discovered that the meetings had occurred, the attorney resigned from the case.[27]   Id.   The defendant then moved to dismiss his indictment because the federal prosecutor violated the No-Contact Rule when meeting with the defendant

---

[26]   The federal prosecutor stated he did so because: (1) the defendants stated his desire to meet without his lawyer, (2) there was an in camera hearing with the magistrate court, and (3) the magistrate court granted permission for the defendant to meet with the federal prosecutor without the defendant's lawyer present.   See Lopez, 765 F. Supp. at 1440-44.
[27] The attorney resigned because the defendant had indicated to the court that the attorney was not necessarily acting in the defendant's best interest, and he did not want to appear as if he and his client had a conflict of interest.   See id.

without his counsel present.[28]  *Id.*  In response, the Government
asserted, among other things, that the federal prosecutor was
exempt from the No-Contact Rule under the Thournburgh
Memorandum.  *Id.* at 1445.

The court disagreed with the Government.  First, the court
noted that in order to be "authorized by law" to be exempt from
such ethical rules, the "law" had to be explicit.  *Id.* at 1448.
The court then observed that within the Thornburgh Memorandum,
there was no case law explicitly supporting the position that
the Department of Justice was exempt from ethical rules.[29]  *Id.*
at 1446-47.  Moreover, the court stated that the Government
could point to no federal statute that expressly gave the
Thornburgh Memorandum's position any merit.  *Id.* at 1448.  In
fact, the court stated that the case law supported the opposite
position: federal prosecutors are subject to ethical rules such
as the No-Contact Rule.  *Id.* at 1449.

Second, the court held that "as the nation's litigator, the
Department and its attorneys must be held accountable to the
same court-adopted ethical rules that govern all other lawyers."
*Id.* at 1450.  In so holding, the court observed that it was
"alarming" that the Department would claim that it should not be

---

[28] He did so upon retaining new counsel.  *See id.*
[29] The court analyzed each case in the Thornburgh Memorandum
cited for the proposition that Department of Justice attorneys
were exempt from state ethics rules and found that none of them
explicitly stood for such a proposition.  *See id.* At 1444.

exempt from ethical rules "in light of the prominent and unique role of the Department of Justice in this country's litigation." Id.

For these reasons, the court concluded that, at least in the post-indictment phase of criminal investigations and prosecutions, the No-Contact Rule applied to federal prosecutors. To the extent the Thornburgh Memorandum said otherwise, "it is misguided and not premised on sound legal authority." Id. The court then found that the prosecutor had violated the No-Contact Rule and, based on this misconduct, the court dismissed the indictment against the defendant.[30] Id. at 1463-64.

The Government appealed, making two arguments. See United States v. Lopez, 4 F.3d 1455 (9th Cir. 1993). First, the Government argued that the No-Contact Rule did not apply to federal prosecutors. Second, it argued that even if it did apply to prosecutors, the district court's dismissal of the

---

[30]In its conclusion, the court did not mince words: "Relying on a faulty and tortured reading of existing authority, the Attorney General has issued a policy directive instructing attorneys of the Department of Justice to disregard a fundamental ethical rule embraced by every jurisdiction in this country." It went on to say that, "[t]his court will not allow the Attorney General to make a mockery of the court's constitutionally-granted powers. The title U.S. Attorney does not give the prosecutor a hunting license exempt from ethical constraints of advocacy. If anything, government prosecutors owe a higher duty to the court and the criminal justice system." Id. (citations and quotations omitted).

indictment was an abuse of discretion. The court disagreed with the Government as to the first issue, but agreed with it as to the second. Id. at 1463-64.

In upholding the district court's ruling that federal prosecutors are not exempt from the No-Contact Rule, the Ninth Circuit did not base its holding on a rejection of the Thornburgh Memorandum. Id. at 1458. This was because the Government had abandoned the argument that the Memorandum exempted the federal prosecutors from the rule (it did so "prudently," in the opinion of the court).[31] Nevertheless, the court did deem the analysis of the district court on the issue as "trenchant," suggesting that it approved of the district court's finding as to the Thornburgh Memorandum's lack of legal force. Id.

However, because the court agreed with the Government that the district court's remedy of dismissing the defendant's indictment was too extreme for the ethical violation involved, the court vacated that part of the ruling. It suggested that instead of dismissal of the indictment, the district court

---

[31] "The government, on appeal, has prudently dropped its dependence on the Thornburgh Memorandum in justifying [the federal prosecutor's] conduct, and has thereby spared us the need of reiterating the district court's trenchant analysis of the inefficacy of the Attorney General's policy statement." Lopez, 4 F. 3d at 1458.

perhaps should have considered referring the federal prosecutor to the state bar for disciplinary proceedings. Id. at 1464.

### c. United States v. Talao

This is the first case that explicitly recognized that the McDade Act repealed the Thornburgh Memorandum and its exemption of federal prosecutors from the No-Contact Rule. United States v. Talao, 222 F.3d 1133 (9th Cir. 2000); see also United States v. Singleton, 165 F.3d 1297, 1302 (10th Cir. 1999)( J. Henry, concurring)(noting that the McDade Act "repeals" the Thornburgh Memorandum).

In Talao, the Government appealed the decision of the district court, which found that the federal prosecutor had violated the No-Contact Rule. The federal prosecutor had engaged in communications with the defendant corporation's bookkeeper, who was represented by the corporation's attorney. In its appeal, however, the Government did not argue that the No-Contact Rule did not apply to the federal prosecutor. Instead, it argued only that the No-Contact Rule did not apply in this case. During the court's discussion of the merits of the Government's argument, it states the following:

> At this point, a brief historical reference appears in order. During the early part of the decade of the 1990s, intense discussions were had between state judicial authorities and the Department of Justice over a position taken by the [Department] in a written communication popularly referred to as the "Thornburgh Memorandum." In essence, that memorandum created

> serious problems by excusing federal attorneys from
> compliance with state ethics rules. The conflict that
> developed was dissipated when the Congress adopted
> what is now 28 U.S.C. § 530(b), and made state ethics
> rules applicable to government attorneys.

Id. at 1139-40.

The court then held that, though the No-Contact Rule did apply to federal prosecutors, this case involved pre-indictment non-custodial communication with the represented party. Accordingly, because the No-Contact Rule in that state did not specifically prohibit pre-indictment non-custodial communication with a represented party, the federal prosecutor's conduct did not violate the No-Conduct rule. See id. at 1140.

### d.  Some conclusions regarding this case law

There are a few common denominators one can draw from the cases on the issue of whether federal prosecutors are exempt from the No-Contact Rule.  First, and most importantly, though courts seem to be divided on the question of whether the No-Contact Rule should apply when prosecutors contact represented defendants prior to indictment or arrest, no court has ever held that federal prosecutors are completely exempt from the No-Contact Rule.  Second, no court ever found that the Thornburgh Memorandum had any legal force that would preempt either state or federal ethics rules.[32]  Third, no court has found any other

---

[32] United States v. Singleton, 144 F.3d 1343, 1354 (10th Cir. 1998)(noting that the "federal courts have unanimously rejected

case law or federal statutes suggesting that federal prosecutors are exempt from the No-Contact Rule. Thus, at the very least, there seems to be a unified perception by the courts that the No-Contact Rule should apply to all lawyers, including federal prosecutors.

### D. When Should the No-Contact Rule Apply

Another key issue in the debate over the No-Contact Rule is _when_ it should apply. This raises two questions. First, should the No-Contact Rule attach at the time of indictment or formal charges, or should it attach at the time the defendant retains counsel in anticipation of a potential indictment? Second, what should courts do about the thorny questions regarding a defendant's attempt to waive his or her No-Contact protections? The Court will now address each of these questions in turn.

#### 1. Pre-indictment vs. Post-indictment

Though the No-Contact Rule, as a whole, has not been subject to attacks regarding its validity, there have been extensive discussions in the courts regarding the circumstances in which the rule should apply. On the one hand, courts seem to agree that the rule prohibits a federal prosecutor from communicating with a represented defendant after the defendant has been formally indicted or charged with a crime. However,

the notion that federal prosecutors are exempt from these ethical rules"), _reh'g en banc,_ 165 F.3d 1297 (10th Cir. 1999).

courts disagree about whether the rule prohibits a federal prosecutor from communicating with a represented defendant after the defendant discovers that he or she is being investigated for a crime, but before the defendant is indicted or formally charged.[33]

Courts that decide that the No-Contact Rule does not apply to pre-indictment investigations often do so because they find that applying the No-Contact Rule in such a situation would rob a federal prosecutor's investigation of its efficacy. See, e.g., United States v. Fitterer, 710 F.2d 1328, 1333 (8th Cir. 1983)("We do not believe [the No-Contact Rule] was intended to stymie undercover operations when the subject retains counsel."). A majority of courts have adopted this position.[34] More specifically, courts have found, first, that the No-Contact Rule as written by the ABA is insufficiently clear on the question of whether it applies pre-indictment, and thus to hold federal prosecutors responsible for a violation of an unclear rule would be inequitable.[35] See e.g., United States v. Ryans,

---

[33] For a good comparison of the conflicting viewpoints, compare Hammad, 858 F.2d at 838 with United States v. Ryans, 903 F.2d 731, 738-39 (10th Cir. 1990).

[34] See United States v. Balter, 91 F.3d 427 (3rd Cir. 1996); United States v. Ryans, 903 F.2d 731, 739 (10th Cir. 1990); United States v. Sutton, 801 F.2d 1346 (D.C. Cir. 1986); United States v. Fitterer, 710 F.2d 1328, 1333 (8th Cir. 1983).

[35] The current version of Model Rule 4.2, Comment 5 states: Communications authorized by law also include constitutionally permissible investigative activities of lawyers representing

903 F.2d 731, 739 (10th Cir. 1990). Moreover, courts have found that during the investigative phase, defendants are less susceptible to "artful" legal questions because the charges are still undefined, and thus prosecutors do not know what specific responses they are trying to elicit from defendant. See United States v. Leomonakis, 485 F.2d 941, 946 (D.C. Cir. 1973). Finally, courts have noted that applying the No-Contact Rule in pre-indictment cases would enable criminal suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations. See United States v. Vasquez, 675 F.2d 16, 17 (2nd Cir. 1982) ("Such a principle would simply enable criminal suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations.").

The Second Circuit has refuted the assertion that the No-Contact Rule should not apply to pre-indictment communication. In United States v. Hammad, 858 F.2d 834 (2nd Cir. 1988), the Second Circuit upheld a lower court finding that the federal prosecutors had violated the No-Contact Rule by communicating with a represented defendant prior to the defendant's indictment. See id. at 839. The court stated:

> Moreover, we resist binding the [No-Contact Rule's] applicability to the moment of indictment. The timing

governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings. MODEL RULES OF PROF'L CONDUCT R. 4.2 cmt. 5 (2007).

of an indictment's return lies substantially within
the control of the prosecutor. Therefore, were we to
construe the rule as dependent upon indictment, a
government attorney could manipulate grand jury
proceedings to avoid its encumbrances.

Id.

First, though the Government argued that the rule was
created only to protect a defendant as far as the Sixth
Amendment did, the Court found that there was nothing on the
face of the Model Rules version of the No-Contact Rule that
suggested it was only to extend to the reaches of the Sixth
Amendment.[36] See id. at 838. Second, the court refuted the idea
that federal prosecutors would not use "artful" techniques
during the investigation phase, observing that the timing of an
indictment is under the control of the prosecutor and could thus
be manipulated to gather information that the prosecutor could
not get post-indictment. Third, the court suggested that if
there is ambiguity as to whether the rule applied in pre-
indictment investigations, that ambiguity should be resolved in
favor of the defendant. After all, the ethical rules urge

---

[36] Thus, the scope of the No-Contact Rule exceeds the
constitutionally mandated criminal procedure rights of the Sixth
Amendment. See MODEL RULES OF PROF'L CONDUCT R. 4.2 cmt. 5
(2007)("The fact that a communication does not violate a state
or federal constitutional right is insufficient to establish
that the communication is permissible under this Rule.").

attorneys to "maintain the highest standards of ethical conduct."[37]  Id.

Though there are valid concerns expressed by courts that find that the rule should not apply pre-indictment, the Hammad court's reasoning, coupled with the reasoning of some scholars considering this issue, is more persuasive.  The reasoning in Hammad is based on sound principles and reflects the goal of the No-Contact Rule: to protect defendants from being tricked into making statements that could help the prosecution sway a jury against them.[38]

The Court in Hammad was careful to urge restraint in applying the No-Contact Rule in the pre-indictment context.  Id. at 840.  It emphasized that ethical questions must always be considered on a case-by-case basis.  Id. at 840; Grievance Comm. for Se. Dist. of N.Y. v. Simels, 48 F.3d 640, 649 (2nd Cir. 1995).  But this Court believes that pre-indictment contact with represented persons should not be the Government's standard

---

[37] "The Constitution defines only the minimal historic safeguards which defendant must receive rather than the outer bounds of those we may afford them.  In other words, the Constitution prescribes a floor below which protections may not fall, rather than a ceiling beyond which they may not rise.  The Model Code of Professional Responsibility, on the other hand, encompasses the attorney's duty to maintain the highest standards of ethical conduct."  Hammad, 858 F.2d at 839.

[38] See Delker, Supra note 10, at 894-96.

practice. For the Government to go behind a lawyer's back is a practice that leads to mischief.[39]

### 2. The Willing Defendant and the No-Contact Rule

In United States v. Lopez, 4 F.3d 1455 (9th Cir. 1993), discussed earlier in detail, a federal prosecutor had direct communications with Lopez, a defendant who had been indicted and was represented by counsel. Id. at 1456-57. In defending his decision, the federal prosecutor claimed that Lopez intimated to him that Lopez's lawyer was not acting in his best interest, and thus Lopez wanted to speak to the federal prosecutor directly about a possible plea bargain. Id. at 1457. The federal prosecutor further claimed that he believed that Lopez felt his attorney was not acting in Lopez's best interest because the attorney was being paid for by drug-dealing associates of Lopez. Id. This was a conflict of interest on the part of the attorney, claimed the federal prosecutor, because the attorney's

---

[39] The Georgia version of Rule 4.2 explicitly states that the No-Contact Rule applies to federal government lawyers. Comment 2 also states:

> Communications authorized by law also include constitutionally permissible investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings, <u>when there is applicable judicial precedent that either has found the activity permissible under this Rule or has found this Rule inapplicable.</u>

GEORGIA RULES OF PROF'L CONDUCT R. 4.2 cmt. 2 (2007)(emphasis added).

real goal was to defend those drug dealers who were paying him, instead of defending Lopez.  Id.

The question arises, what role does the No-Contact Rule play in cases such as Lopez, where a federal prosecutor claims that a defendant waived his right to have his attorney present during communications with that prosecutor?  When faced with a No-Contact Rule violation accusation, federal prosecutors often bring up the argument brought up in Lopez; namely that the defendant talked to the prosecutor because the defendant's lawyer was not acting in his best interest.[40]  How should the courts deal with this issue?  Should the No-Contact Rule be ignored if a defendant approaches a federal investigator or prosecutor, instead of the other way around?  Should it matter whether the defendant does so before or after indictment?

In this Court's opinion, when a federal investigator or prosecutor is approached by a defendant for a meeting, either before or after indictment, and the defendant does not wish to have his or her attorney present during that meeting, the federal prosecutor should ask either a magistrate or district court judge for an in-camera hearing on whether the parties may

---

[40] As a United States attorney and as a federal judge, I have learned that it is a rare federal prosecutor who has not encountered this scenario.

communicate.[41]  During that hearing, the judge can decide whether or not the defendant is making a decision based on reason and is doing so without coercion from the Government.  If the judge does find that the defendant may communicate with the federal prosecutor, this decision will come under the "authorized by law" exception of the No-Contact Rule, and thus the prosecutor can legally use the information culled from the communication with the defendant.

This is the approach endorsed by Comment 6 to Model Rule 4.2, which states:  "A lawyer who is uncertain whether a communication with a represented person is permissible may seek a court order.  A lawyer may also seek a court order in exceptional circumstances to authorize a communication that would otherwise be prohibited by this Rule . . . ."  By doing

---

[41] Such a suggestion would make the remedy in Rule 4.2 very similar to the Model Rules of Professional Conduct Rule 3.8(f). In that rule, which is a relatively recent addition to the Model Rules, brought about in 1990, a prosecutor must get judicial approval, to elicit information from another attorney about that attorney's client.  For a brief discussion of the history of this rule, see Susan P. Koniak, The Law between the Bar and the State, 70 N.C. L. Rev. 1389, 1400-02 (1992).  To see a case in which a court found that Rule 3.8(f) was found to be an ethical rule that applied to federal prosecutors under the McDade Act, see United States v. Colo. Supreme Court, 189 F.3d 1281, 1284 (10th Cir. 1999).  However, it should be noted that, like the No-Contact Rule, Rule 3.8(f) as applied to prosecutors has been controversial.  Compare Whitehouse v. United States Dist. Court for the Dist. of R.I., 53 F.3d 1349 (1st Cir. 1995) (holding that federal prosecutors were not exempt from Rule 3.8(f),with Baylson v. Disciplinary Bd. of the Supreme Court of Pa., 975 F.2d 102 (3rd Cir. 1992) (holding federal prosecutors were exempt from Rule 3.8(f)).

so, the prosecutor is shielded from accusations of ethical violations.

### D.  **What Should Federal Courts Do?**

Both state and federal courts have held that Rule 4.2 applies to federal prosecutors, but this has not ended the controversy surrounding this issue.  In this Court's opinion, the No-Contact Rule should be interpreted by courts as a guide for professionalism among attorneys, not as a vehicle for conferring substantive criminal rights not provided by the Constitution.  The ABA Model Rules of Professional Conduct, and state rules modeled after them, are not meant to grant substantive rights to clients, but rather to provide a means by which the courts and lawyers regulate conduct within the legal profession.  In re Grand Jury Subpoena, 533 F. Supp. 2d 602, 608 (W.D.N.C. 2007) (holding that Model Rule 3.8(e) is "not intended to create any substantive rights or procedural hurdles"); United States v. Acosta, 111 F. Supp. 2d 1082, 1095 (E.D. Wis. 2000)("[T]he rules of professional conduct are not intended to create substantive rights.").

Criminal defendants are protected by the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel.  These amendments protect a criminal defendant from the power of the government.  Meaningful assistance of counsel is a constitutional guarantee, entitled to protection

and respect from the courts. This guarantee should not be thought of as a mere philanthropic social policy.

However, the scope of the No-Contact Rule and the scope of the Sixth Amendment are not identical. There are areas where an ethical violation by a prosecutor is not so great as to violate a constitutional right of the defendant. See MODEL RULES OF PROF'L CONDUCT R. 4.2 cmt. 5. Where there is a constitutional violation, the court has the uncontroverted power to uphold the Constitution and to suppress evidence or reverse a conviction. But there are areas where an ethical violation will fall short of a constitutional violation requiring a substantive remedy such as suppression of evidence, reversal of a conviction, or dismissal of an indictment. Id.

Absent the implication of a defendant's substantive rights, violation of Rule 4.2 is akin to "harmless error" and should not be enough for a court to grant a substantive remedy affecting a defendant's case. The ethical rules do not state anywhere therein that they create any substantive rights, and courts should not read substantive rights into the rules of legal ethics. See United States v. Lowery, 166 F.3d 1119, 1125 (11th Cir. 1999)(holding that state rules of professional conduct do not provide authority for exclusion of evidence in federal court). Unless there is a statutory or constitutional violation, a violation of the No-Contact Rule should result only

in sanctioning of the prosecutor, or perhaps even his or her immediate supervisor, whoever the court deems is at fault.

When judges are advised of a prosecutor's violation of the No-Contact Rule, they have the authority to act and should be willing to do so. The overwhelming majority of ethical and professional lawyers expect and want them to do so. Judges must not tolerate a prosecutor's violation of the No-Contact Rule. If the judge sees a violation and does nothing, then the judge sends the wrong message to the members of the bar.

When the court endeavors to protect the integrity of the judicial system, then a sanction of the attorney is clearly an appropriate remedy. The court has several arrows in its quiver. Courts have the power to fine the prosecutor, suspend the prosecutor from the case, suspend the prosecutor from appearing in district court in any case, and refer the prosecutor's violation to the State Bar Association for discipline or possible disbarment proceedings. The detrimental effect of making a prosecutor who breaks the rules subject to fine, suspension from the case, suspension from appearing before the court in any case, loss of reputation, and possible disbarment should be sufficient to protect the integrity of the judicial system.

This Court finds, therefore, that the approach used in the district courts in Hammad and Lopez is not appropriate. The

only appropriate remedy for a violation of the No-Contact Rule, at least one which does not rise to constitutional proportions, is for the court to exercise its many options in sanctioning the prosecutor.  Ethical rules are demeaned when they are used as a procedural weapon to enforce substantive rights and they are not meant to be used in this manner.[42]

The Department of Justice's heavy handed approach to the No-Contact Rule has been an inappropriate response to what it perceives to be a problem: that the rule inhibits its prosecutors in the performance of their official duties.  The Department's view has been too one-sided and does not recognize the defendant's important constitutional guarantee of assistance of counsel, and the important interest of the courts and states in regulating and supervising the conduct of all attorneys.

The Attorney General of the United States, as head of the Department of Justice, provides direction and policy advice to the individual United States Attorneys.  Notwithstanding the modern role of the Attorney General as the head of the Department of Justice and chief federal law enforcement policy maker, United States Attorneys still retain a substantial degree of independence and prosecutorial discretion in determining law enforcement priorities and making litigation decisions in their

---

[42] This should not suggest, however, that a violation of Rule 4.2 could never rise to the level of a constitutional violation.

districts.  Thus, if the Attorney General does not change the Department's position on the No-Contact Rule, <u>the individual United States Attorneys should exercise their independence and turn away from the rationales of the Thornburgh Memorandum, and should instead fully embrace Rule 4.2 to further the integrity of their offices and improve the administration of justice within the federal courts</u>.

### E.   AUSA Johnson's Contacts with Defendant Tapp

The Court now turns to the specific question at issue in this case, namely, whether the alleged misconduct entitles Defendant to the relief she seeks in her Motion to Dismiss.  The Court finds that dismissal of the Indictment is not an appropriate remedy.  A target appearing before a grand jury does not have a Sixth Amendment right to counsel.  <u>United States v. Mandujano</u>, 425 U.S. 564, 581, 96 S. Ct. 1768, 48 L. Ed. 2d 212 (1976); <u>United States v. Ramsey</u>, 785 F.2d 184, 193 (7th Cir. 1986).  In addition, a defendant has "no constitutional right to plea bargain."  <u>United States v. Rankin</u>, 572 F.2d 503, 505 (5th Cir. 1978)(<u>citing</u> <u>Weatherford v. Bursey</u>, 429 U.S. 545, 561, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977).  And as discussed above, this Court will not read substantive rights into the rules of legal ethics.  <u>See</u> <u>Lowery</u>, 166 F.3d at 1125 (holding that state rules of professional conduct do not provide authority for

exclusion of evidence in federal court). Accordingly, the Court denies the relief requested by Defendant.

Notwithstanding the Court's ruling on this issue in this case, it is this Court's opinion that taking a defendant to the grand jury without notifying his or her lawyer is a bad practice that only invites the type of issues that have arisen here. Because Defendant and her lawyer were both ready and willing to cooperate, the contacts in this case served no investigative purpose. Furthermore, the Court's denial of Defendant's requested relief does not mean that the Court condones this practice in any way. To the contrary, the Court has already indicated its position regarding the applicability of the No-Contact Rule to federal prosecutors during the pre-indictment stage of an investigation, and the Court has set forth the appropriate procedure should a prosecutor believe that such contacts are necessary.

As a result of AUSA Johnson's ill-advised conduct, she has already been removed from this case by the United States Attorney. Had the United States Attorney not already taken this action, then the Court would have exercised its authority to supervise the conduct of attorneys that practice before it, including Assistant United States Attorneys, and would have removed AUSA Johnson from the case.

## CONCLUSION

The issue decided by the Court in this Order is whether the alleged misconduct entitles Defendant to the relief she seeks in her Motion to Dismiss and Motion for Downward Departure. The Court holds that it does not. Accordingly, the Motions are **DENIED.**

SO ORDERED this 4th day of June, 2008.

WILLIAM T. MOORE, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA